First case this morning is Mary Ann Smalley v. Workers' Compensation Comm'n, 5-0-9-0-1-5-9. Counsel, please. Did the full counsel ever get here? No. Okay, let's proceed then. Which one's your opponent? At the table, please. Please proceed. May it please the Court, Counsel. My name is Christina Cooksey and I represent the employee Mary Ann Smalley. Mrs. Smalley made a claim for benefits under the Illinois Workers' Compensation Act on June 2, 2005. Two years earlier, on March 3, 2004, she was eating food provided by the respondent in the school cafeteria. She was a working teacher, had been such for nearly two decades, I believe 17 years. And at that time when she was ingesting some chicken, she choked on what appeared to be a chicken bone or some sort of large chunk of meat. She was attended to during her coughing fit and choking fit by several of the respondent's employees and was transported ultimately by ambulance to Memorial Hospital, accompanied by a respondent school nurse, where she underwent significant testing. She continued to have pain during an endoscopic evaluation and was noted to have a laceration of the distal esophagus, along with a small mass defect at the esophagastric junction. She was in Memorial Hospital admitted ultimately because of severe symptoms that she was having. She was having trouble eating, swallowing, and difficulty with deep breaths. She continued to have these symptoms and continued to undergo quite a bit of testing. On March 13, 2004, she underwent an upper endoscopy at St. Mary's in Clayton. At that time, Dr. Greenspan saw significant objective findings. Besides the laceration that had already been diagnosed at Memorial Hospital, Dr. Greenspan's endoscopy showed a demarcation of mucosa with an area possibly of abnormal mucosa in the area of the upper esophageal signature. He specifically noted that this was possibly evidence of trauma and took biopsies. He saw edema and erythema and indicated either grade 2 to 3. He indicated that he saw evidence of trauma. So his working diagnosis was a tear of the distal esophagus, a polyp, and an inflammation of the posterior vocal cords. Respondent admitted before the commission that she did sustain an injury that arose out of an in-person scope of her employment and also admitted that her condition through May 19, 2004 was related to this chicken bone incident. The remaining dispute, and why we're here in front of the court today, is the medical treatment and time off work that Mrs. Smalley underwent beyond May 19, 2004. Records show before this date, before May 19, 2004, Mrs. Smalley simply could not eat. She had a documented weight in February of that year before this incident of 154 pounds. Weeks after the incident, she was 118 pounds. There was significant medical treatment for oral intake, malnourishment, and dehydration. She continued to complain of pain upon eating and anxiety resulting from the incident, resulting from the pain she experienced while eating, and resulting from the fear of eating and the pain that would result from that. She had some difficulty with anxiety and depression before this incident, didn't she? Yes, Your Honor, she certainly did. And the commission did note that in their decision, and I believe assigned inappropriate weight. There are three medical records that show that she had anxiety before the accident. The first one they looked at was 14 months before the accident, where she said that she had some stress and anxiety, but no panic attacks. No other anxiety was discussed until, admittedly, the month before this accident, where in two visits she said that she had some stress. I'm sorry, let me go back. It was 14 months before. Then nine months later, she went to the doctor and complained about stress at work, and said she was nervous, jittery, and anxious. No indication of any problems eating, drinking, swallowing, or stomach discomfort. And in fact, then three weeks before the accident, she did say she was having panic attacks, and that these panic attacks were not well controlled, that she was undergoing stress. However, again, that just leads credence to the fact that when she had this incident, when she had objective findings of this incident, it did cause a significant amount of anxiety to her. Taking narcotic medication before this event? Yes, she was taking narcotic medication before this event. However, the month before, she was 154 pounds, never had trouble eating, never had trouble drinking, never had any trouble with her stomach, except one documented case of esophageal discomfort, when she noted that she was on the Atkin diet, and that was in 2002, July of 2002. So really, what's an issue here is the issue of whether or not the claimant proved that her post-May 19, 2004 condition was causally related to the work accident in March, correct? Yes. It appears that what the case boils down to is you've got the opinions, the claimant of Drs. Wade and Bernstein, and then you've got the opinions of Dr. Brouwer and Chang-Pong. The commission chose to assign more weight and credibility to the opinions of Brouwer and Chang-Pong with regard to the causation opinion. Yes. So why is the commission in error, and why can't the commission do that? I believe that the commission is completely in error in doing this. The two IME doctors came in in 2005. This is two years after the incident. They looked at her once and said, no, this was resolved within a week. Respondent admits that this went on through May 19. She had no other problems, eating, drinking, abdominal pain, before this. And then what I would urge the court to do is to look at the medical records before the lawyers got involved. Look at what the doctors are saying. That summer, between May 19 and when she ultimately had to have a line put into her chest to keep her hydrated. She'd never had this happen before. The doctors felt that it was real, and she went to the doctor while she was off work, I think it was ten times that summer, saying, I can't eat, I can't drink, I'm dehydrated. There are notes in the records where they've had nurses in the office trying to hydrate her, and they had to send her to the hospital because they couldn't get an IV because she was so dehydrated. Well, was it up to the commission, though, to assess the weight and the credibility of the claimant as well as the doctors? And in this case, the arbitrator found that the claimant was extremely credible. But the commission didn't, and you're appealing to the commission's decision, right? Not the arbitrator's decision. Yes, we are, Your Honor. And if you look at the IME doctors versus the doctors who treated her, all the way through this incident, the doctors who looked at her, the IME doctors say, yeah, within a week it's gone, there's nothing there. But there are objective findings and multiple doctors in the records between the date of the incident and the date of the IME who said, yeah, this is a difficult case. Yeah, she's got more going on here, but they all said that a causative factor, which is all we have to prove, a causative factor of her condition was when she took on this treatment. Except, no, that's not quite true. Dr. Brower conceded that she had an abrasion, a distal esophageal abrasion or laceration, but her recovery from that event had been complete by March 13, 2004, when the endoscopy, which she underwent, failed to show any abrasion or laceration. Now, that's an objective test. And what I read to you before, the objective findings on March 14, or March 13, what Dr. Greenspan saw, who was not hired by anyone in this case, and this is a year and a half before she ever filed an application for an adjustment of claim, Dr. Greenspan said, I see a demarcation of mucosa with an area possibly of normal mucosa. This is evidence of trauma, and he took biopsies. And this is a doctor who's not being paid by anyone. And when was this? This was the date that Dr. Brower said it's resolved, March 13. And this is within the date that respondent says, yeah, we admit that this is related. I think the record is clear. The record is clear that I think certainly there's objective medical findings to support the finding that the claimant on March 3, 2004 sustained an injury. I think that's pretty clear from the record. I don't know that anybody's reasonably disputing that. But I would say March 13 didn't. Let's take a look at March 13. But with regards to the post-May 19, 2004 issues, what objective medical findings, objective medical findings aside from the subjective complaints of the claimant, support the finding that there is ongoing medical issues related to the accident of March 3, 2004? I would, again, point to the fact that she's unable to eat. No doctor denied that. She's unable to drink. No doctor denied that. She's never had this problem before. This is when it started. She's lost 30-some pounds. She's dehydrated to the point that they put a system on her. But you've also conceded there's other issues the doctors have said going in with your claimant, medical as well as psychological, correct? Both issues correct. But if that's an aggravation of a pre-existing condition, are you still able to claim compensation? If that's an aggravation of a pre-existing condition, if you can link that to an aggravation, are you still not within the purview of the act? Absolutely, Your Honor. And that's Petitioner's whole argument is that this is a causative factor, that she did have pre-existing pain, she did have pre-existing anxiety. But I don't believe that three records of anxiety when you have an objective finding of injury and new complaints that had never before happened, that never resolved to the point that doctors are putting her on home health care for fluids because she's so dehydrated because of the pain she feels when she intakes food. Is there any doctor that links, because you're talking about, because everyone likes objective physical evidence, okay? Yeah. But the point is you have pre-existing condition of anxiety, am I correct, that she is being treated for prior to this incident? There's no dispute of that, yes, Your Honor. Okay. And what is the subject of that anxiety? Is it eating? No, Your Honor. There are three records in evidence. The first one was stress with a teenage daughter as well as her husband. The second one was six months before the accident she was stressed at work. And the third one was she's continuing to have stress at work. Okay. Do you have any doctor that's venturing an opinion that that anxiety had been increased to where it triggers into this behavior of eating disorder? That would be, and the name just went out of my, Dr. Mark Bernstein on June 9, 2005 said that this is complex, that yes, when you have this type of stomach, this type of stomach complaints and you're trying to use medication to resolve either acid or pain or whatever is causing her to have this pain, not be able to eat, not be able to drink, that there was some overlay between her anxiety and this condition and that it was a complex condition that would require continued care. Well, ideally your case would be much stronger if you had someone saying there's a level of anxiety regardless of whether it's derived from these other factors. There's an incident. The anxiety now has increased or manifested itself into an eating disorder which creates all these physical complaints and linking it to that incident of the chicken. Do you have anything in that clear cut? I believe that the testimony of Dr. Wade along with the testimony of Dr. or the letter of Dr. Bernstein to which the doctor referred to in his deposition does link that. Dr. Wade kind of undercuts your entire theory. He testified that the narcotic medication that she was taking for an extended period of time can cause abdominal pain, nausea, constipation, bowel discomfort, and several of the medications she's taking prior to the chicken bone incident could have caused these symptoms. That was Wade's testimony. I think that is inaccurate with regard to his testimony and the evidence. The evidence doesn't show. If she is, in fact, as respondent asserts, taking all sorts of narcotic medication in the two months before the accident, where's the stomach pain? There's not any reference to that. If she is taking these for a while. I don't think you get the stomach pain the first day you take the medicine. I think you start getting the stomach pain after you take the medicine for an extended period of time. And that's what Wade said. Extended use of medication can cause abdominal pain. Not the use. Extended use. And she was taking this stuff for two months before the chicken bone incident. And as to your abrasion on the date of the incident, Chang Pong testified that it was merely a superficial abrasion of the mucosa of the distal most esophagus. And he found no evidence of a perforation or any structural abnormality. No causal connection between the incident and her claimed symptoms. So why isn't this just a battle of the experts? The commission chose to believe Robert Chang Pong. I believe that the court could look at it that way, but then it would have to discount the two years of treatment before the experts come into play. It would have to discount all of her consistent acute symptoms immediately after the incident, and it would have to discount all of that medical evidence that this was nothing she experienced before. This is absolutely what she experienced after. She never got relieved. And, yes, she's taking medication, but the doctors, the experts, did say they hadn't stricken the right balance with her, and that was part of the problem. Your time is up, counsel. Okay. Counsel, please. Good morning, Your Honors. My name is Jill Baker with the law firm of Eminent Fitzgibbons on behalf of the Signal Hills School District. I believe the evidence clearly shows that the decision of the commission is not against the manifest weight of the evidence. The petitioner was working as a music teacher in March of 2004 when she sustained some type of injury while eating. She sought medical treatment, and even the doctors at the initial medical treatment felt that some of her problems could be due to peptic disease, viral disease, a yeast problem, and they also felt that a tear was less likely. CT scans showed a superficial laceration, and after she was released from care, she returned to work part-time on March 22nd, just a few weeks after this injury, and she returned full-time to work on April 1st of 2004, less than one month. Later in April, she saw Dr. Prakash, who opined that her small abrasion had completely resolved and that all testing had been normal. Later in April, Dr. Greenspan, these are all treating physicians, opined that her extensive workup was unremarkable and that she had an emotional overlay. Counsel, you can argue, of course, that there was no objective findings past the May 19th date that would support the finding that this was causally connected to the March 3rd date. What about the argument that the chicken bone incident aggravated a pre-existing condition, and all of this was causally connected to aggravating a pre-existing condition? Would that be compensable under the act? If there was medical evidence to indicate that it was, it did aggravate it, but in the evidence that we have in front of us, that is not present. We have even Dr. Wade, the petitioner's own treating physician, who's a family practitioner who treats her for a variety of problems, it's probably 20 different conditions she's had during the period of time of this treatment. He said this problem was way out of his league. He could not figure out what her problem was. So how can we rely upon his opinion that is related? And that is the only treating physician who has provided a causal relationship opinion. We have several treating physicians who found that she had no objective findings and found that she had extensive problems before this in terms of emotional problems, some depression. The opposing counsel read a long litany of complaints, conditions, incidents that she suffered from following the incident that were different than what happened. What is your assessment of the cause of that? Well, I believe that there are a significant amount of problems. She was on nine prescription medications before this happened. So she had been following doctors for a variety of different problems. Even if we look at, I think it's interesting that their counsel is saying she lost weight. Even if you look at the medical records, she wanted to lose weight. That was seen in the medical records, and I don't know how you can attribute a significant amount of weight loss to this one incident, particularly when she said that was her desire and that she was on the Atkins diet to lose weight. That's in the testimony? I believe it was in the medical records, not the testimony. So Dr. Brower opined that none of her current symptoms or need for any work restrictions were related to the incident of March 3rd. And Dr. Chang-Pong opined that there was no scientific basis between her complaints and the event of March 3rd. So I believe that the commission properly found that the petitioner's condition after May 19th was not related to the incident of the chicken bun. Is that really what the commission found? I don't think that's what the commission found. The commission didn't find that it wasn't. They found she failed to prove it. Failed to prove it, yes. Which is a little bit different. Thank you, Constance. Thank you. Rebecca? I would just like to address only one point, and that one point would be that somehow my client wanted to lose weight and so dropped 30 pounds in the weeks after the accident because she can't eat and she can't drink. In 2002 she went to the doctor, not expressing a desire to lose weight, but said she changed her diet, started the Atkins diet. This is a year and a half before the accident. We don't know what her weight was at that point. A year and a half before, I apologize, before the accident, and said my stomach is a little upset. That's the record they put in to show that she had all these preexisting stomach problems. There aren't any preexisting stomach problems. What do you do with Dr. Warner's notes? She goes to Warner in August of 2004, complaining of abdominal pain. He tells her to go to the emergency room. She says she won't. She sees Warner again the following day, complaining of abdominal pain, dehydration, dry mouth and dizziness. His notes reflect that her pain from a few months prior had resolved would be the pain from the chicken bone incident and that her present pain was in the mid or lower quadrant from an entirely different area of the body. And he's her treater. I don't have that note in front of me. If I recollect correctly, what the ER note says and what his note says is that she went to the ER because of pain, but also because of dehydration, and that she had had a bad experience at the ER, waited four hours and they only put her on an IV for ten minutes. She wasn't there seeking medication. She was there seeking hydration, and that she did not want to go spend five hours at the ER for ten minutes of hydration and elected to see him the next day. I do believe that that pain, and she saw him, as I indicated, ten times over that summer, was all related to the incident and either trying to treat the hydration and the pain she was having as a result of the incident or her ability not to eat or drink since that incident. So Warner's note does not say that her pain was caused by something in the mid and lower quadrant of her stomach? I don't have the note in front of me. I'm not going to... Prakash, on August 10th of 2004, diagnoses her from suffering from reflux and advises her to quit taking Xanax and Zofran. She wasn't taking Xanax or Zofran because of the chicken bone incident. I believe that was prescribed because of her anxiety as a result of what happened and the symptoms that had never stopped since the chicken bone incident. She had been taking that stuff before the chicken bone incident for her anxiety and her depression. It was my understanding that those had changed. Thank you, Counsel. Thank you, Your Honor.